UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
COREY D. WHITLOCK,

                Petitioner,

      -against-

THOMAS LaVALLEY, Superintendent,
Clinton Correctional Facility

                Respondent.
------------------------------------------------------x

**MEMORANDUM & ORDER**

13 CV 5772 (RJD)

DEARIE, District Judge.

      Before the Court is petitioner Corey D. Whitlock's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner was convicted in 2008, after a jury trial in Supreme Court, Queens County, of Murder in the Second Degree (N.Y. Penal Law, or "P.L.," § 125.25) (intentional), Criminal Possession of a Weapon in the Second Degree (P.L. § 265.02), and Endangering the Welfare of a Child (P.L. § 265.03). He is currently serving a sentence of 25 years to life.[1]

      The charges relate to the shooting of man inside his car, in broad daylight on a busy Queens street and in front of the man's children and adult relatives. Only the youngest son (eight

---

[1] Petitioner was sentenced to concurrent terms of 25 years to life on the murder count, 15 years plus five years of post-release supervision on the weapon possession count, and one year for child endangerment. Orders of protection were also issued on behalf of the murder victim's son (a witness at trial, as will be discussed) and that boy's mother.

years old when the crime occurred) testified at trial; the others told investigators they did not see the shooter.

As summarized by the Appellate Division in its decision affirming petitioner's conviction, the testimony at trial established the following:

> On April 27, 2005, at about 5:00 p.m., Carl Murray, Jr., drove to Beach 54th Street and Beach Channel Drive in Queens with his then-15-year-old son seated in the passenger seat of his car and his then eight-year-old son in the back seat. As Murray was parking his car, a gunman fired at him through the windshield of the vehicle. Murray's older son ducked down and exited the car as Murray was struck in the chest with two bullets. When the shooting occurred, Murray's father, brother, and eldest son were standing approximately 8 to 10 feet from his vehicle.

> With his younger son still in the car, Murray drove himself to a hospital one block away, where he collapsed in the doorway of the emergency room, and later died from his wounds. Just after Murray arrived at the hospital, a police officer heard Murray's younger son say, "C-Lo[] shot Daddy," referring to [petitioner] by his "street" name.

> Although [petitioner] was ordinarily seen in the area where the shooting occurred, he was not located until he surrendered to the police on an unrelated charge eight months after the shooting. [He] was charged . . . after Murray's younger son identified [him] as the shooter in a six-person lineup.[2]

People v. Whitlock, 95 A.D.3d 909, 909-910 (2d Dep't 2012), lv. app. denied, 19 N.Y.3d 978 (2012).

The principal theme of the petition is the assertion, fashioned as a claim of ineffective assistance of counsel, that petitioner is innocent and that he wanted to testify to that effect at trial but did not because, due to counsel's inadequate advice, he did not know that the decision to

---

[2] As will be discussed *infra* at pp. 10 et seq., the victim's son first identified petitioner as the shooter in a single, confirmatory photograph, then in a lineup approximately eight months later, and a full three years later at trial. Additional pertinent features of the record are discussed in the context of the claim to which they relate.

testify was his to make. Petitioner brought this claim in a postconviction motion in state court and was granted an evidentiary hearing and appointed counsel. Both petitioner and his trial attorney testified, and in a 19-page decision resting principally on credibility findings, the state court rejected the claim, and the Appellate Division denied leave to appeal. Under the governing standards set forth below, the Court has not been shown a factual or legal basis to disturb the state court's adjudication of this claim.

As additional grounds for habeas relief, petitioner claims (i) that the prosecutor's summation amounted to misconduct denying him a fair trial; (ii) that the identification of him by the victim's eight-year old son, Carlmique Belnavis, was improper; and (iii) that trial counsel was ineffective because he allegedly failed to investigate petitioner's alibi defense and failed to utilize prior inconsistent statements to impeach Carlmique. Each of these claims was denied in state court on substantive or procedural grounds and petitioner has failed to meet the standard required to disturb those rulings.

Therefore, as discussed in full below, petitioner's application is denied and the petition is dismissed.

## DISCUSSION

## GENERAL HABEAS STANDARDS

### Threshold Requirements: Constitutional Nature of Claim, Procedural Integrity (Exhaustion, "Independent and Adequate State Law" Doctrine, and Related Procedural Concerns)

First and foremost, "federal habeas corpus relief does not lie for errors of state law." Lewis v. Jeffers, 497 U.S. 764, 780 (1990). Rather, "28 U.S.C. §2254 allows a court to entertain a habeas petition 'only on the ground that [an individual] is in custody in violation of the

*Constitution or laws or treaties of the United States.*'" Garner v. Lee, 908 F.3d 845, 860 (2d Cir. 2018) (quoting, 28 U.S.C. § 2254(a)) (emphasis added).

Second, before bringing bona fide federal claims to the habeas court, the petitioner must first exhaust those claims by fully and fairly presenting the substance of each to the highest state court. See 28 U.S.C.§ 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State."); Picard v. Connor, 404 U.S. 270, 275 (1971) ("federal habeas corpus statute . . . embodies the long-established principle that a state prisoner seeking federal habeas review of his conviction ordinarily must first exhaust available state remedies"); Daye v. Attorney Gen. of State of New York, 696 F.2d 186, 191 (2d Cir. 1982) ("In order to have fairly presented his federal claim to the state courts, the petitioner must have informed the state court of both the factual and the legal premises of the claim he asserts in federal court").

The habeas statute also recognizes that where "there is an absence of available State corrective process" or "circumstances that render such process ineffective to protect the [petitioner's] rights," the exhaustion requirement may be waived. 28 U.S.C. §2254(b)(1)(B). The statute also provides that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2).

Third, with respect to exhausted, bona fide federal claims, the pool of cognizable claims shrinks further. Under a longstanding principle of habeas jurisprudence, "a federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule." Davila v. Davis,

137 S. Ct. 2058, 2064 (2017); <u>Coleman v. Thompson</u>, 501 U.S. 722, 729 (1991) (habeas claim is procedurally barred if it was decided "on a state law ground that is independent of the federal question and adequate to support the judgment."). This principle "ensure[s] that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism." <u>Martinez v. Ryan</u>, 566 U.S. 1, 9 (2012). Importantly, the bar applies "even where the state court has also ruled in the alternative on the merits of the federal claim," which is often the case. <u>Velasquez v. Leonardo</u>, 898 F.2d 7, 9 (2d Cir. 1990). <u>See also</u> <u>Harris v. Reed</u>, 489 U.S. 255, 264 n. 10, (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding") (emphasis in original).

There is some give, however, in this rule. <u>See</u> <u>Garner v. Lee</u>, 908 F.3d 845, 859 (2d Cir. 2018) ("While a state court may rest its judgment on a state procedural bar if it rejects the merits of a federal claim *only in the alternative*, . . . the Supreme Court has admonished that, when in doubt, courts should presume that the state court adjudicated the claim on the merits") (emphasis in original), <u>cert.</u> <u>denied</u>, 139 S. Ct. 1608 (2019). In short, the state court must express the nature of its holding unambiguously. <u>See</u> <u>id.</u> ("for this procedural default rule to apply, the state court must have clearly and expressly stated that its judgment rested on a state procedural bar. . . . In other words, it must be 'clear from the face of the opinion' that the state court's decision rested on a state procedural bar.") (internal quotations, citations, and alterations omitted).

"To bar habeas review ... the state court's decision must rest not only on an independent procedural bar under state law, but also on one that is adequate to support the judgment." <u>Murden v. Artuz</u>, 497 F.3d 178, 191 (2d Cir. 2007) (internal quotation and citation omitted), <u>cert.</u> <u>denied</u>, 552 U.S. 1150 (2008). A state procedural bar "is 'adequate' if it 'is firmly established and regularly followed by the state in question' in the specific circumstances presented." <u>Id.</u>

(quoting, <u>Monroe v. Kuhlman</u>, 433 F.3d 236, 241 (2d Cir. 2006)). The most common state law procedural ground that arises, the requirement that an issue be preserved by contemporaneous objection, <u>see generally</u> N.Y. Criminal Procedure Law §470.05(2), has been held to be a firmly established and regularly followed rule for these purposes. <u>Richardson v. Greene</u>, 497 F. 3d 212, 217-18 (2d Cir. 2007); <u>Petronio v. Walsh</u>, 736 F. Supp. 2d 640, 653 (E.D.N.Y. 2010).[3] Another frequently encountered state law ground, the rule that a claim based upon a matter of record at trial should be raised on direct appeal and cannot be pursued in a motion for collateral relief under N.Y. CPL §440.10, has also been held to be firmly established and regularly followed. <u>Dominique v. Artus</u>, 25 F. Supp.3d 321, 333 (E.D.N.Y. 2014) (collecting cases).

Importantly, although "adequacy is itself a federal question," <u>Lee v. Kemna</u>, 534 U.S. 362, 375 (2002) (internal quotation and citation omitted), "[habeas courts'] function ... is not to ... peer over the shoulder of the state court judge ruling on questions of state law ... Instead ... we are to determine only whether the state ruling falls within the state's usual practice and is justified by legitimate state interests, not whether the state court ruling was correct." <u>Downs v. Lape</u>, 657 F.3d 97, 101 (2d Cir. 2011) (internal quotations and citations omitted), <u>cert. denied</u>, 566 U.S. 1014 (2012); <u>Lewis v. Jeffers</u>, 497 U.S. 764, 780 (1990) ("federal habeas corpus relief does not lie for errors of state law."). Finally, the "independent and adequate state ground" bar may be bypassed only if a petitioner demonstrates either "cause" for failing to comply with the state rule and "actual prejudice" if the claim is not reached, or that a lack of federal review will result in a fundamental miscarriage of justice because he is actually innocent. <u>Harris v. Reed</u>,

---

[3] In the context of challenges to the legal sufficiency of the evidence, this rule requires that a defendant identify the specific evidentiary deficiency rather than merely move for dismissal at the close of the state's case. <u>People v. Hawkins</u>, 11 N.Y.3d 484, 492 (2008).

489 U.S. 255, 262 (1989); <u>Wainwright v. Sykes</u>, 433 U.S. 72, 87 (1977). Most commonly,

petitioners attempt to show "cause" through a claim of ineffective assistance of counsel, but to

qualify as "cause" for this purpose the ineffectiveness claim must be independently exhausted.

<u>Edwards v. Carpenter</u>, 529 U.S. 446, 452 (2000). If a petitioner fails to show cause the Court

need not consider whether he would be prejudiced by the failure to reach his claim. <u>Murray v.

Carrier</u>, 477 U.S. 478, 498 (1986).


**Substantive Review Standards**

The current habeas statute provides in relevant part as follows:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim . . . resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States.

28 U.S.C. § 2254(1), as amended by the Antiterrorism and Death Penalty Act of 1996

("AEDPA").

The Supreme Court has repeatedly explained that this statute "erects a formidable barrier

to federal habeas relief," <u>Burt v. Titlow</u>, 571 U.S. 12, 19 (2013), because it embodies "a

foundational principle of our federal system: State courts are adequate forums for the vindication

of federal rights . . . and are thus presumptively competent [ ] to adjudicate claims arising under

the laws of the United States." <u>Id.</u> at 19. Indeed, federal habeas courts "will not lightly conclude

that a State's criminal justice system has experienced the extreme malfunction for which federal

habeas relief is the remedy." <u>Id.</u> at 16 (internal quotations, citations and alterations omitted). <u>See

also</u> <u>Virginia v. Le Blanc</u>, 137 S. Ct. 1726, 1728 (2017) ("In order for a state court's decision to

be an unreasonable application of this Court's case law, the ruling must be objectively

7

unreasonable, not merely wrong; even clear error will not suffice") (internal quotation marks and citations omitted); Renico v. Lett, 559 U.S. 766, 773 (2010) ("AEDPA [ ] imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt") (internal quotations omitted); but see Brumfield v. Cain, 135 S. Ct. 2269, 2277 (2015) ("As we have also observed, however, even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review, and does not by definition preclude relief.") (internal quotation marks, citation and alterations omitted).

As the Supreme Court has recently reiterated:

> The federal habeas statute … imposes important limitations on the power of federal courts to overturn the judgments of state courts in criminal cases. The statute respects the authority and ability of state courts and their dedication to the protection of constitutional rights. Thus, under the statutory provision at issue here, 28 U.S.C. §2254(d)(1), habeas relief may be granted only if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of," Supreme Court precedent that was "clearly established" at the time of the adjudication. … This means that a state court's ruling must be so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Shoop v. Hill, 139 S. Ct. 504, 506–07 (2019) (internal quotations and citations omitted). Accord Orlando v. Nassau Cty. Dist. Attorney's Office, 915 F.3d 113, 121 (2d Cir. 2019) ("unreasonable application" standard of § 2254(d)(1) is a "bar [that] is not reached where fairminded jurists could disagree on the correctness of the state court's decision") (internal quotation and citation omitted). In short, "[i]f this standard is difficult to meet—and it is—that is because it was meant to be." Burt, 571 U.S. at 20 (internal quotations, citations and alterations omitted).[4]

---

[4] Although most claims involve the "unreasonable application" clause of §2254(d)(1), a petitioner occasionally invokes the "contrary to" clause, which requires that he show that the state court, when rejecting his claim, "directly contradict[ed] a holding of the Supreme Court."

Alternatively, under the less frequently invoked second branch of § 2254(d), a petitioner may seek habeas relief by challenging the factual basis of the adverse state court ruling. See 28 U.S.C. §2254(d)(2) (habeas court may overturn the state court's decision only if it was "based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceedings." Id. A "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, 558 U.S. 290, 301 (2010). Further, 28 U.S.C. § 2254(e)(1) provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and that the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."[5]

Finally, "[d]eciding whether a state court's decision 'involved' an unreasonable application of federal law or 'was based on' an unreasonable determination of the facts requires the federal habeas court to train its attention on the particular reasons—both legal and factual— why [the] state courts rejected a state prisoner's federal claims…and to give appropriate deference to that decision." Wilson v. Sellers, 138 S. Ct. 1188, 1191-92 (2018) (internal quotations and citations omitted). When the last state court decision is a simple affirmance, denial of leave, or otherwise not accompanied with reasons, Wilson "hold[s] that the federal

---

Evans. v. Fischer, 712 F.3d 125, 132 (2d Cir.) (internal quotation and citation omitted), cert. denied, 571 U.S. 899 (2013).

[5] The Supreme Court and the Second Circuit have declined to address the relationship between §2254(d)(2) and §2254 (e)(1). See Brumfield, 135 S. Ct. at 2282 ("We have not yet defined the precise relationship between § 2254(d)(2) and § 2254(e)(1)") (internal quotation and citation omitted); Garguilio v. Heath, 586 Fed. App'x 764, 766 n. 1 (2d Cir. Oct. 10, 2014).

court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale." Id. at 1192.

## ANALYSIS OF PETITIONER'S CLAIMS

### I.    The Improper Identification Claim

Petitioner challenges as suggestive and improper the so-called "confirmatory" or "*Rodriguez*" identification protocol followed by the police in this case.

In People v. Rodriguez, 79 N.Y.2d 445 (1992), the New York Court of Appeals held that:

> [t]he People bear the burden in any instance they claim that a citizen identification procedure was "merely confirmatory." The unusual treatment accorded such identifications—no CPL 710.30 notice or *Wade* hearing is necessary—requires that the exception be narrowly confined to situations where "suggestiveness" is not a concern. Thus, the People must show that the protagonists are known to one another, or. . . [that] that the witness knows defendant so well as to be impervious to police suggestion.

Id., 79 N.Y.2d at 452 (internal citation and quotation omitted).

At a pre-trial *Rodriguez* hearing, Detective James Schmalenberger testified that he conducted a "confirmatory" identification procedure with Carlmique on the day of the crime (April 27, 2005), which means that he "showed a single photograph [of petitioner] to the witness." R. Tr. at 4.[6]   The photo came from the police department's computer. R. Tr. at 17.

The detective stated that he proceeded in this manner because Carlmique had stated that "he knew [petitioner] by the name C-Lo," that "C-Lo was shooting at the car." R. Tr. at 5. The

---

[6] "R. Tr." refers to pages in the transcript of the *Rodriguez* hearing held June 23, 2008 in Supreme Court, Queens County, before Hon. Robert J. Hanophy.  See generally Parham v. Griffin, 86 F.Supp.3d 161, n .3 (E.D.N.Y. 2015) (*Rodriguez* hearing is "held when the People contend that the witness had 'sufficient familiarity' to make it irrelevant whether the identification procedure was unduly suggestive") (internal citations and quotations omitted).

detective also "kn[e]w who C-Lo was" based on "his own experience in that neighborhood." Id. The detective recounted that he had "asked [Carlmique] how he knew him by the name C-Lo [and Carlmique] said he knew him because in the past, his father referred to him as C-Lo when they saw him on the street and his father also spoke to him in the past calling him by the name C-Lo." Id. Carlmique also said that he had observed petitioner "well over 15, 20 times" over the years. Id. (When asked by petitioner's counsel on cross-examination "[w]hat was the witness's response when you showed [him] the photo?" the detective replied, "He said that's C-Lo" and never used either the name "Corey" or "Whitlock." R. Tr. at 17).[7] The detective acknowledged that he never asked Carlmique when he first met or spoke with petitioner.

The detective recounted briefly the six-person line-up he conducted on December 3, 2005. R. Tr. at 8-9. It took place in a room approximately six feet deep, Carlmique was approximately six feet away from the viewing mirror, either his mother or aunt was also present, and the boy identified petitioner as someone he knew from the corner of Beach 54th Street. Id. at 8-9. The state also introduced two photographs of the lineup. Id. at 10.

At the close of the detective's testimony, the prosecutor rested, defense counsel stated that he was resting, and the court indicated it was ready to move on to the *Sandoval* portion of hearing when defense counsel announced that petitioner would be testifying. Id. at 18.

Petitioner testified that he never used the nickname C-Lo and was never called by that name. Id. at 19. He had heard the name used for someone else he did not know. The name was

_____

[7] At trial, when asked whether he knew petitioner before the shooting, Carlmique replied, "Yes, a little." Trial Tr. 338. "A little" meant he "saw him a couple of times...[l]ike going in the store and coming out." Id. at 338. The boy knew petitioner by the name "C-Lo[ ]" before that day "[b]ecause that's what everybody calls him." Id. at 339.

11

also a street term for a dice game. Id. When confronted on cross-examination by the possibility

that when arrested he had stated his nickname was C-Lo, petitioner reiterated that he "never went

by the name C-Lo." Id. at 23. Petitioner was handed an arrest worksheet on a prior case (not

admitted in evidence), directed to the "highlighted portion of [his] pedigree information where it

indicated you indicated to the officer you were known as C-Lo" and asked if that refreshed his

recollection, and he reiterated that he "didn't tell the officer that [his] nickname was C-Lo." Id.

at 24, 27.[8]

Additionally, petitioner denied knowing a boy by the name of Carlmique Belnavis. Id. at

19, 28. He insisted he never saw him on the street or with his mother, although he admitted that

he dated the mother, Monique, for "[m]aybe a year" during high school. Id. at 28-29. He also

denied any other relation to the murder victim or his family. R. Tr. at 30. Finally, he admitted

that he lived in the "neighborhood" in which the incident occurred from the time he was four

years old until his early twenties, but no longer lived there. He admitted that, at the time Murray

was killed, he was in the area, exercising at a nearby park, located "in between 56[th] and 58

Street," which was "around the corner from where [the murder] happened." Id. at 20, 30-31.

The trial court denied the motion to suppress in a written decision. People v. Whitlock,

Ind. No. 3146/05, slip op. (Supreme Co., Queens Co. July 2, 2008). The court credited the

---

[8] The trial court twice referred to this portion of petitioner's testimony. At sentencing, when
rejecting defense counsel's continued insistence that petitioner "was never known as C-Lo,"
Sentencing Tr. at 15, the court referenced the reports from petitioner's *three* prior arrests
indicating he went by the name "C-Lo" and told counsel he was "lucky [his] client is not being
indicted on three counts of perjury" based on his denials, in the face of these documents, at the
*Rodriguez* hearing. Id. Additionally, when rejecting petitioner's testimony at the postconviction
evidentiary hearing as not credible, the court referenced his *Rodriguez* testimony in finding
petitioner generally willing to lie under oath. See *infra* at p. 31 et seq.

detective's testimony and found that Carlmique knew petitioner by his nickname from the neighborhood and from conversations he observed between his father and petitioner during which his father called petitioner C-Lo. Id. at 4. The court therefore concluded that "the confirmatory exception" applied. Id. (citing People v. Rodriguez, 79 N.Y.2d 445 (1992)).

The court also concluded that the lineup "was in all respect fair and not suggestive in its composition" as the others in the lineup "were sufficiently similar to [petitioner] in appearance," and that "the procedure used to view the lineup" was also proper and not suggestive. Id.

Petitioner raised his identification claim on appeal and the Appellate Division rejected it on the merits. The court concluded that "[c]ontrary to [petitioner's] contentions in his *pro se* supplemental brief, the testimony at the *Rodriguez* hearing . . . established that his identification by Murray's youngest son in a single photograph was merely confirmatory…and he was not entitled to a *Wade* hearing . . . on that issue." Whitlock, 95 A.D.3d at 911 (internal citations omitted). The issue was included in petitioner's leave application, which the Court of Appeals denied. People v. Whitlock, 19 N.Y.3d 1978 (July 30, 2012).

Petitioner argues that the showing of only a single photo to an impressionable eight-year old boy is an inherently suggestive maneuver on the part of the police, that this suggestiveness taints the later six-person lineup, and that he was therefore entitled to litigate his suggestiveness claim at a full *Wade* hearing—particularly here, where the boy was the only witness to the crime. Nevertheless, the Appellate Division's determination that the hearing court correctly concluded that the *Rodriguez* confirmatory exception applies—which obviates the need for a *Wade* hearing—presents only a question of state law not cognizable here. See, e.g., Wilson v. Heath, 2013 WL 5530673, at *4 (E.D.N.Y. 2013) ("whether the identification falls into the category of the 'confirmatory identification exception' under New York law is a state law issue that should

13

not be reviewed by this [habeas] Court"); Wiggins v. Greiner, 132 Fed. App'x 861, 865 n. 3 (2d

Cir. 2005) ("[u]nder New York law, a 'confirmatory identification' from a single photograph

does not implicate due process concerns" and "[w]hether the challenged photo . . . qualifies as a

confirmatory identification is an issue of state law not relevant to our habeas review").[9]

Assuming arguendo that the identification claim implicates constitutional concerns, the

state court's adjudication of that claim was neither contrary to nor an unreasonable application of

the controlling Supreme Court identification cases, nor factually unreasonable within the

meaning of the habeas statute. The applicable Supreme Court precedent is Perry v. New

Hampshire, 565 US. 228 (2012), and earlier authorities cited therein. See Sexton v. Beaudreax,

138 S. Ct. 2555, 2559 (2018) (for § 2254 purposes, identifies Perry and cases it collects as

setting forth "the approach appropriately used to determine whether the Due Process Clause

requires suppression of an eyewitness identification tainted by police arrangement"). Under

these authorities, "due process concerns arise only when law enforcement officers use an

identification procedure that is *both* suggestive and unnecessary." Perry, 565 U.S. at 238-239

(emphasis added). A procedure is "impermissibly suggestive" only if it "give[s] rise to a very

substantial likelihood of irreparable misidentification." Sexton, 138 S. Ct. at 2559 (internal

citations and quotations omitted). Further,

> [e]ven when an unnecessarily suggestive procedure was used, suppression of the
> resulting identification is not the inevitable consequence. . . . Instead, the Due

---

[9] In other words, it is the Rodriguez protocol—which is a creature of state law—that authorizes
trial courts in New York to dispense with a *Wade* hearing when, as the state showed here, "the
witness knows defendant so well as to be impervious to police suggestion." Rodriguez,
Petitioner's claim that he was improperly deprived of a *Wade* hearing therefore does not present
a basis for habeas relief. See also Watkins v. Sowders, 449 U.S. 341, 349 (1981) (refusing to
adopt, as constitutionally required, "a per se rule compelling. . . a judicial determination outside
the presence of the jury of the admissibility of identification evidence").

Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a substantial likelihood of misidentification. ... Reliability of the eyewitness identification is the linchpin of that evaluation. The factors affecting reliability include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.

Id. (internal citations, quotations and alterations omitted).

This Court concludes that petitioner's improper identification claim fails to establish a basis for habeas relief. According to the detective's testimony at the *Rodriguez* hearing, Carlmique had observed petitioner speaking to his father in the past, had also seen petitioner on numerous other occasions over the span of several years. On the basis of these observations, according to the detective, Carlmique knew that petitioner's nickname was C-Lo. The detective further testified that Carlmique exhibited no hesitation or equivocation when he identified petitioner as C-Lo and as the man who shot his father. The hearing court's decisions to credit the detective's testimony and to decline to credit the conflicting testimony offered by petitioner are factual findings that are presumed correct. See 28 U.S.C. § 2254(e); Woodhouse v. Walsh, 2015 WL 382657, at *5 & n. 73 (S.D.N.Y. June 19, 2015) (on federal habeas, credibility-based state court determinations are entitled to presumption of correctness) (collecting authorities); Bennett v. United States, 663 F.3d 71, 85 (2d Cir. 2011) (in analogous 28 U.S.C. § 2255 context, "[i]ssues involving credibility are normally considered factual matters" and "credibility determinations" are due "special deference" because of "the superiority of the trial judge's position" to make them) (internal quotations and citations omitted). Petitioner has offered no basis to rebut the presumption of correctness.

Based on the credited testimony, the state court's decision not to suppress Carlmique's identification was not an unreasonable application of the Perry and Sexton standards. The

15

relevant question is whether any arguable suggestiveness in the confirmatory photograph protocol "created a substantial likelihood of misidentification." Sexton, 138 S. Ct. at 2559. The answer, on the basis of the record reviewed here, is plainly no. For the same reasons, the identification procedure here does not remotely approach the edge of due process acceptability.[10]

## II. Improper Summation

Petitioner claims he was denied his due process right to a fair trial because of alleged improprieties committed by the prosecutor during summation. He first challenges the prosecutor's argument that there was no reason for Carlmique to lie. The prosecutor stated, *inter alia*, "Is there some reason why this eight-year-old boy would say it's this defendant when it wasn't? . . . What motive was there for him to lie? You have not heard one shred of evidence...that suggests that he had some reason, some motive to frame the defendant...What good would it do this eight-year-old little boy to tell this detective this defendant shot and killed his father if that didn't happen." Trial Tr. 594-595. Petitioner argues that by these remarks, the prosecutor improperly vouched for the credibility of the witness and shifted the burden of proof

---

[10] As the Supreme Court observed in Sexton, "only once" has that court held that pretrial identification procedures were so suggestive as to violate the Due Process Clause. Id. That case, Foster v. California, 394 U.S. 440 (1969), involved an extreme level of suggestiveness not present here. In an initial three-man lineup, the suspect (Walter Foster) was approximately six inches taller than the other two participants; he was also the only one wearing a leather jacket, which the only witness to the crime (Joseph David) had said he saw on the robber. After viewing the lineup, David "thought" Foster was the robber but was not sure. Foster, 394 U.S. at 441. The police then allowed David to speak with Foster across a table in a room with only the prosecutor present. Even then, David remained "not sure." Id. A week to ten days later, David viewed a five-man lineup. Foster was the only one in this second lineup who had also been in the first. This time, David was "convinced" that petitioner was the robber. Id.

to him by implying that he had an affirmative duty to produce evidence. (The trial court overruled defense counsel's objection to these remarks).

Petitioner also says it was improper for the prosecutor to argue that "only this defendant knows why he did it, not this eleven-year-old boy. He doesn't know back then, he doesn't know now." Id. at 598. Petitioner argues that these remarks were prejudicial because they implied that his silence and failure to testify deprived the jury of a true picture of what occurred.

Finally, petitioner complains about the theme of arrogance advanced in the summation. The prosecutor argued that because the crime was committed in broad daylight on a busy street, the act was "of somebody who thinks nobody is going to snitch on him." Id. at 589. The prosecutor also described petitioner as "arrogant enough to commit this act [in that way] thinking that he would never ever be held responsible, thinking, you know, the code on the street [is] that you don't snitch." Id. at 618-619. The prosecutor further argued that petitioner "was almost right [b]ecause nobody else outside, that any of the detectives spoke to or [are] here before you, was willing to say it was this defendant except a courageous and brave eight-year-old boy." Id. at 589.[11] Petitioner complains that this remark denied him a fair trial because it improperly

---

[11] Defense counsel had requested a missing witness charge as to the individuals who were at the scene but told investigators they did not see the shooter. He argued that, even accepting their claimed inability to identify the shooter, they were able to observe the physical features of the shooter, to testify whether they saw him in the area before or after the shooting, and perhaps to fill in other gaps in Carlmique's account. The court denied the request on the ground that none of the witnesses saw "anything." Trial Tr. at 555. Petitioner raised this claim on appeal, and the Appellate Division rejected it as "untimely" and in any event lacking in merit. Whitlock, 95 A.D.3d at 911. The Appellate Division found that petitioner "failed to meet his burden of establishing his prima facie entitlement to a missing witness charge in the absence of any evidence that the uncalled witnesses had knowledge of a material issue or would provide noncumulative testimony, particularly in light of the investigating officer's testimony that he interviewed the uncalled witnesses, each of whom told him that they did not see who shot Murray." Id. Although petitioner recounts his pursuit of this claim in his factual background, he

17

appealed to the sympathy of the jurors. To the same effect, he asserts, is the prosecutor's statement that "any of you, as grown adults, would be shaken, traumatized by that experience. Can you imagine how an eight-year-old would feel?" Id. at 605.

Petitioner raised this claim on appeal, and the Appellate Division ruled, first, that, "with the exception of one comment concerning [petitioner's] 'arrogance' and his reliance on the 'code of the streets,'" the claim was "unpreserved for appellate review." Whitlock, 95 A.D.3d at 911. Reaching the merits in the alternative, the appellate court also ruled that, "[i]n any event, the remarks challenged by the defendant's unpreserved contentions were within the broad scope of rhetorical comment permissible in closing arguments, were fair comment on the evidence, or were responsive to defense counsel's assertions on summation." Id. Finally, the court held that, "[a]s for [petitioner's] preserved contention, any error resulting from the remark was harmless." Id.

Neither component of petitioner's improper summation claim presents a basis for habeas relief. The challenged comments that the Appellate Division treated as unpreserved—an independent and adequate state law ground—are procedurally barred here. See Coleman v. Thompson, 501 U.S. 722, 729 (1991).[12] In any event, these comments do not remotely approach

_____

very clearly does *not* identify this claim as a ground for habeas relief. See Amended Petition, ECF Doc. 22 at p. 6 et seq.

[12] The Appellate Division's alternative holding that the unpreserved claim lacks merit does not remove the procedural bar. See Harris v. Reed, 489 U.S. 255, 264 n. 10 (1989). The bar could be lifted upon a showing of cause and prejudice, id., but petitioner has not addressed cause: the likely available option would be a claim that counsel was ineffective for failing to object, but to constitute "cause" that ineffectiveness claim must be—but isn't here—independently exhausted. Edwards v. Carpenter, 529 U.S. 446, 452 (2000). Since petitioner has not shown cause in this manner, this Court need not consider whether he would be prejudiced by the failure to reach his claim. Murray v. Carrier, 477 U.S. 478, 498 (1986).

the level of a due process violation under the controlling standards for collateral challenges to prosecutorial misconduct. See generally Darden v. Wainwright, 477 U.S. 168, 181 (1986) (test is not whether prosecutor's statements to the jury were "'undesirable or even universally condemned'.... The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'") (internal quotation and citation omitted).

As for the comment concerning petitioner's "arrogance" and reliance on the "code of the streets," which the Appellate Division found to harmless error, the requirements for habeas relief have likewise not been met. First, the Appellate Division relied only on state cases based on state law, so it did not find constitutional error.[13] Further, even without citing federal cases or federal law, the Appellate Division's conclusion that this feature of the summation was improper is not, on this record, tantamount to a finding that the Darden standard has been met. Nor could it be: plainly, the testimony of a murder victim's young son—who is also the sole eyewitness to the crime—has such a uniquely powerful probative value in a trial that it cannot reasonably be said that the challenged prosecutorial comment attributing "arrogance" to petitioner "infected" that trial in the way Darden prohibits. Furthermore, even if the prosecutor's remarks could be

_____

[13] For this reason, the Court does not believe that Brecht harmless error analysis is required. See generally Brecht v. Abrahamson, 507 U.S. 619, 622 (1993) (holding that, in habeas proceedings, "the standard for determining whether a conviction must be set aside because of *federal constitutional* error" is whether that error "had a substantial and injurious effect or influence in determining the jury's verdict.") (internal quotations and citation omitted) (emphasis added); Fry v. Pliler, 551 U.S. 112, 121-22 (2007)( holding that "in § 2254 proceedings a court must assess the prejudicial impact of *constitutional* error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in Brecht [ ] whether or not the state appellate court recognized the error and reviewed it for harmlessness under the [former federal standard]") (emphasis added). The state court did not find constitutional error, but even if it did, for the reasons about to be discussed, this Court would agree that any such error was harmless.

construed as shifting the burden of proof, suggesting that an unfavorable inference be drawn from the fact that petitioner did not testify, vouching for credibility, or appealing to the jury's sympathy, the court's instructions on these subjects minimized the risk of any real prejudice.[14]

Further, given the totality of the record, the comment, though deemed improper by the Appellate Division, was hardly beyond the pale, as matters made part of the record at sentencing confirm. At that time, the prosecutor requested, and the court granted, an order of protection in favor of both Carlmique and his mother. As the prosecutor explained to the court, Carlmique's mother resisted petitioner's effort to reach out to her after the verdict; the prosecution had reason to be concerned that he was trying to persuade the boy to change his story. Sent. Tr. at 10-11. The prosecutor further argued that in the eight months between the crime and petitioner's voluntary surrender on a different charge, petitioner had been "taking care of business trying to make sure that nobody came forward to testify against him." Id. at 10. Although not in the *Rodriguez* hearing testimony, the prosecutor informed the court at sentencing that "in fact, when [petitioner] was put in a lineup ... there was a filler who looked similar to him who suggested to petitioner that he sit next to him because [he] looked similar" and the detectives "overheard" petitioner say, "I don't need to do this, I got this taken care of, nobody's going to pick me out." Id. at 11. When the detectives told him he had been picked out and was being charged with murder, "he went ballistic in his cell." Id. Finally, the court itself revisited this theme in its sentencing remarks, commenting that "[t]his case is . . . about a courageous, courageous eight-

---

[14] See Trial Tr. at 625-27, 632-37 (burden of proof); 644 (no unfavorable inference because defendant did not testify); 620 (not to consider sympathy in deliberations) and 622-24, 627-28 (how to evaluate witness credibility including role of witness's age). The Court must presume that the jury followed the court's instructions. Blueford v. Arkansas, 566 U.S. 599 (2012).

year-old boy who showed more guts—I am reading the [DD-5's] on the people who were around there and something smells…" Sent. Tr. at 22.

## III. Ineffective Assistance of Counsel

### A.    Additional Background

#### 1.    *Petitioner's Claims*

On or about December 11, 2013, petitioner filed a motion pursuant to C.P.L. § 440.10(1)(h) seeking to vacate his judgment of conviction on the grounds of ineffective assistance and "actual innocence."

Petitioner repeats here the ineffectiveness allegations raised in his §440.10 motion; they are that his trial lawyer Wilson A. LaFaurie (i) failed to investigate his alibi defense or produce the alibi witnesses to testify; (ii) failed to seek to impeach Carlmique with prior inconsistent statements; and (iii) failed to advise petitioner that he had the right to testify on his own behalf and that the decision whether to do so was his to make. His actual innocence claim is premised on the affidavits of alibi witnesses Keith Jenkins and Leevone Newton which state, in substance, that petitioner was exercising with them in a park around the corner from the crime scene at the time they heard shots being fired.

Petitioner filed the Jenkins and Newton affidavits as exhibits to his motion to vacate, which was supported by his own 16-page affidavit and 54-page memorandum of law (both quite coherently written for pro se submissions) and nine additional exhibits, including, inter alia: (i) an affidavit from petitioner's mother Michelle Whitlock describing a conversation with defense counsel during which he reportedly said, in substance, that the case against petitioner was weak and that he need not put on a defense; (ii) transcript pages highlighting variances between

Carlmique's grand jury and trial testimony;[15] and (iii) the DD-5's of the investigative interviews

of the victim's son Carl Stackhouse (who had been in the passenger seat at the time of the crime)

and daughter Carletta Stackhouse, which reveal, in substance, that Carl did not see who fired the

shots because he put his head down, but also that he, his uncle and grandfather got in a car and

followed Murray as he drove himself to the hospital.

On the issue of his right to testify, petitioner asserted in his affidavit that Mr. LaFaurie

"made it seem as though [he] could not testify as it would disturb counsel's newly found decision

to lay dormant because he felt the People's case was weak," and petitioner's testimony "would

have disturbed an 80% chance of a favorable verdict." Pet'r Aff. at ¶26. Petitioner insists,

however, that he did not know that "ultimately it was his choice to make, not that of his attorney"

and that had he known, "he would have exercised his right, and in doing so, would have

explained to jurors that he was indeed present in the Edgemere Houses on the date and time in

question, but was not present at the location of Beach 54th Street and Beach Channel Drive." Id.

at ¶27. Petitioner argued that his alibi was inherently credible because "if he was going to

---

[15] For example, Carlmique told the grand jury that the shooter was five minutes away when firing at the car, while at trial he said the shooter was standing "[b]y the fence," which was approximately the distance between the witness stand the rail dividing the courtroom. He also told the grand jury that his cousin Russell was in the car whereas at trial he stated that his brother's two friends were also in the car, but he did not remember their names. Trial Tr. at 336-340. These discrepancies are minor.

At sentencing, further addressing this point, the prosecutor "state[d] for the record that [Carlmique's] grandfather is somebody who's known as 'Preacher Man' in the Far Rockaway community …[and] is known to have . . . over 30 children," and that Carlmique's father "has many children with many different women." Sent. Tr. at 3-4. Carlmique "was not brought up in this community" and, the prosecutor argued, it was therefore not unusual that he does not know the names of all his cousins, uncles and brothers.

fabricate a story" he would have "chosen an alibi placing him in another borough" instead of only a block away. Id. at ¶28

### 2. The First §440.10 Ruling

By written decision dated May 1, 2015 ("First 440 Dec.") the court addressed each branch of the claim separately.

The court rejected the claim that counsel was not ineffective for failing to investigate and present an alibi defense. Noting that counsel had given consideration to the issue by filing a notice of alibi defense, see C.P.L. §250.20(1), and by speaking with one of the potential witnesses, the court concluded that the decision ultimately not to put on the defense "must be viewed as a strateg[y]. . . that was more than reasonable under the circumstances." First 440 Dec. at 8. The court reasoned:

> Although the proposed alibi witnesses would have testified that they were in the park working out with [petitioner] at around the time of the shooting, the location of the park in relation to the crime scene, approximately one block away... would have squarely placed [petitioner] in the vicinity of the crime scene and would have served more to corroborate the eyewitness testimony than support an alibi defense. Id.

The court further reasoned that the alibi witnesses "could also have corroborated" that petitioner's "street name" was C-Lo," which "could have strengthened the People's case." Id. In sum, the court concluded that in light of the "youth of the identifying witness" in a "one witness case," the state's case "was relatively weak" and the election not to call the alibi witnesses was a sound strategic decision not to bolster it. Id. at 9.

The court did not reach the merits of the specific claim that counsel's cross-examination of Carlmique was inadequate, concluding instead that it was a record-based claim that should have been raised on direct appeal. Id. at 8.

The court further found that counsel provided meaningful representation under New York standards and that his performance was objectively reasonable under *Strickland* because he "was prepared, amply familiar with the case factually and legally." Id. at 7. The court found that counsel "pursued a legitimate trial strategy of creating reasonable doubt . . . by highlighting consistencies in the child eyewitness's testimony" and by challenging the reliability of his identification "given his youth." Id. Counsel also gave a strong summation. Id.

The court also rejected petitioner's actual innocence claim. See generally People v. Hamilton, 115 A.D.3d 12 (2d Dep't 2014) (a freestanding claim of actual innocence is a cognizable ground to vacate a judgment of conviction pursuant to CPL 440.10 (1) (h); standard is clear and convincing evidence that, *inter alia*, was discovered after trial). The court concluded both that the alibi witness statements did not establish petitioner's innocence and that, in any event, they were known at the time of trial. Id. at 9.

Finally, on the right to testify branch of the ineffectiveness claim, the court noted that the state, in opposing the motion, reported that it had discussed the claim with petitioner's trial counsel but did not submit an affirmation from counsel addressing the claims. The court therefore ordered a hearing and appointed counsel.

### 3. *The Evidentiary Hearing*

The evidentiary hearing on petitioner's claim that counsel failed to advise him that he had the right to decide whether to testify at trial was held on July 15 and August 6, 2015.

Counsel testified that at the time he represented petitioner, he had been a criminal defense attorney for 14 years. During that time he handled thousands of cases and tried more than 100. Before his defense work, he was a prosecutor at the Brooklyn District Attorney's Office and tried approximately 30 cases there. Accordingly, he knew "absolutely" that it was a defendant's right

to decide whether to testify and that it was his duty to so advise his clients, and it was his regular practice to do so. 440 Hearing Tr. at 10-11. Counsel testified repeatedly, in response to several variations of the question through direct, cross, redirect, re-cross and direct inquiry by the court, that he would not prevent a client from testifying if the client chose to do so even if was against the client's best interest.

With respect to his representation of petitioner, counsel recalled having had many discussions with him, almost daily, in the courtroom, in the cells in the courthouse, and at Rikers Island. Id. at 5, 46. Counsel further testified, however, that he had no specific recollection of any conversations with petitioner about whether he would testify. The pertinent testimony is as follows:

> Q. Do you recall whether [petitioner's] right to testify was discussed?
> A. I don't recall.
> Q. Do you recall whether the issue of him testifying or not testifying was discussed?
> A. I don't remember that.
> Q. Do you recall that after the People rested there was a discussion in the back between you and [petitioner]?
> A. I can't say for certain that there was a discussion in the back with [petitioner] concerning testimony.
> Q. . . . And do you have any specific recollections as to whether you advised Mr. Whitlock that it was his decision whether to testify?
> A. I really don't and I have read the transcript over, and that doesn't help my recollection. Id. at 5-6.

Counsel's asserted lack of recall was unwavering. For example, when asked "if ultimately the defendant decided not to follow your advice and testify, would you prevent him from doing so," counsel replied, "No, I could never do that." The next question was, "And did you do that in connection with this case" and counsel replied, "I don't recall ever having a conversation with [petitioner] concerning testimony." Id. at 11.

The following occurred during re-cross:

Q. Let's just be clear. It is your testimony here today that you have no recollection whatsoever about this issue about the defendant testifying in this case?

A. I have no recollection at all, and the transcript does not assist in any way…My file doesn't indicate anything, and the transcript doesn't indicate anything, and my memory doesn't indicate anything. Id. at 44.

Counsel also testified that in the approximately 100 criminal cases he tried before representing petitioner, approximately ten percent of his clients testified. Id. He also concurred with the proposition that, "at the conclusion of the People's case…[he] would have a practice of discussing…the quality of the evidence that the jury has [sic] hearing in determining whether or not it is a good idea [for the defendant] to testify." Id. He further agreed that that was the practice he "would have engaged in in those hundred trials including the ten percent where defendants testify." Id. He further testified: "but there was a deviation in this case . . . from normal practice." Id. The deviation was that, "usually the judge and [he] will have a discussion on the record concerning the defendant testifying, and very often the judge will actually look over to a defendant and say, is this your choice? Do you wish to testify? Not only ask me but ask the defendant. I have read the transcript and there was no discussion between me, Judge Hanophy and [petitioner]." Id. at 45.

Finally, when asked if he could think of anything that would have caused him to vary from his usual practices, LaFaurie said, "I have asked myself that question, and I do wonder if I had a memory issue during this trial." Id. at 28. He explained that "[a]nywhere from three to nine months" before the trial, after a tick bite, he contracted Lyme's Disease and Rocky Mountain Spotted Fever. He spent ten days in intensive care, had two blood transfusions, "and later on learned that the effects of that potentially are memory." Id. Nevertheless, counsel

26

testified that upon thorough review of the trial transcript that he did not believe the prior illness impaired his ability to represent petitioner. Id. at 29. He responded "absolutely" when asked whether he was able to conduct pre-trial hearings, deliver an opening, examine witnesses and so forth. Id.

Turning to the C.P.L. § 330.30 motion to set aside the verdict that he prepared, which did not include denial of the right to testify as a ground for relief, counsel confirmed that he had discussed the motion with petitioner and that petitioner did not complain at that time that he had been denied his right to testify nor ask that the motion raise a claim to that effect. Counsel added that if petitioner had brought up the matter then he "absolutely" would have raised the claim. Id. at 32-35.[16]

Petitioner, for his part, testified to having specific recollections of conversations with counsel about his testifying at trial. Of note:

Q.    . . . you and Mr. LaFaurie discussed the case frequently?
A.    Yes, we did.
Q.    And did the subject of your testifying at trial ever come up during those discussions?
A.    Yes, they did.
Q.    At Riker's Island, he explained to me that he wanted me to bring out the... reputation of the neighborhood...and also...testify at the Rodriguez hearing so that I could be prepared for the testimony at trial.

---

[16] The 440 hearing occurred more than 8 years after the trial, and counsel acknowledged that he had only limited recall of some of the other junctures where the possibility of petitioner eventually testifying at trial was in the mix, such as at the *Sandoval* and *Rodriguez* hearings. Counsel reviewed the applicable transcripts to refresh his recollection and acknowledged at the *Sandoval* hearing that some of his arguments anticipated the possibility of petitioner later testifying at trial but did not recall whether his remarks at the time were strategic or factual. At the 440 hearing, counsel recalled only that the *Sandoval* ruling was generally unfavorable but not the specifics. Inter alia, the *Sandoval* ruling permitted the state to cross-examine petitioner about the facts underlying his 1995 attempted robbery conviction (based upon a guilty plea) which included petitioner holding a gun to a victim's head while demanding money.

> Q. ...did you have an opinion concerning whether you wanted to testify at trial?
>
> A. Yes, I did. We both agreed that it would be a good thing to do.

440 Hearing Tr. 2:8.[17]

As to why he ultimately did not testify at trial, petitioner testified, "[b]ecause Mr. LaFaurie told me that he didn't—he didn't believe that I should." Id. at 9. He then testified:

> Q. And did the subject ever come up of whose decision it was whether or not you should testify?
>
> A. He never—he never addressed that. He just said that he wouldn't allow me to do that. When I said why, why would you not want to produce me or the alibi witnesses, he said I can't let you do that. He explained that the People's case was weak. He said that it was a[n] 80 percent chance of a favorable verdict and he made his way back to the courtroom. He never gave me the opportunity to even, I don't know, he just shut down.
>
> Q. And did you insist on testifying in spite of the fact that he didn't want to put you on?
>
> A. Yes, I did.
>
> Q. And what happened at that point?
>
> A. He made his way back to the courtroom. He explained [again, that the case was weak] and I expressed to him again that I would like to testify...and his made his way back to the courtroom. Id. at 8-9.

Petitioner confirmed, however, that even "at this stage of time," he "still had faith" in his attorney. Id. [18]

The prosecution's cross-examination explored, inter alia, the moment at the *Rodriguez* hearing when counsel rested at the close of the prosecution's case, a conversation occurred between petitioner and counsel, and then petitioner took the stand. Id. at 25-27. Petitioner reiterated his claim that counsel and he had previously agreed that he would testify. Id. As for

---

[17] The hearing transcript pagination is not continuous but rebegins for the second day, when petitioner testified.

[18] Mr. LaFaurie was the third attorney to represent petitioner in this prosecution. He was hired because he had previously represented petitioner, successfully, on a parole violation.

the ensuing off-the-record conversation, petitioner testified: "it wasn't me really saying that I wanted to testify" but was "basically refreshing his memory" as to their prior agreement that he would testify. Id. at 26-27.

With respect to the *Sandoval* hearing and ruling, petitioner testified to an easy recollection of the ruling and the crimes about which he could be cross-examined but was initially evasive with respect to whether the risks of the jury hearing this information was something he discussed with counsel. Id. at 28-29. He acknowledged, however, that, if he had testified, he could have been cross-examined about at least the attempted robbery and a parole violation. Likewise, he also understood that if he testified and denied using the name C-Lo the prosecution would be allowed to call police officers involved in three previous arrests in which he had used that nickname. Id. at 30-31. He testified, however, that he "didn't have to discuss" these matters with counsel "because the prosecutor mentioned [it] in open court." Id. at 31-32. Similarly, he confirmed that at the *Rodriguez* hearing he testified that he was "around the corner" from the homicide at the time it occurred, id. at 33, and then testified that counsel "never" discussed with him the risk of testifying to that effect at trial. Id. at 34.

Finally, petitioner confirmed that, as he had attested in his motion papers, he would have pled guilty if he had known that counsel was not going to present the alibi defense or put him on the stand. Id. at 35. He clarified that he would have pled guilty but, "wouldn't have admitted any guilt because I am not guilty." Id. at 36.

### 4. The Post-Hearing 440 Decision

In a 19-page credibility-based decision the 440 court found that, "[petitioner] has failed to establish by a preponderance of the evidence at the hearing that counsel failed to inform him that the decision to testify was his and that counsel denied him the right to testify when he had

chosen to do so." People v. Whitlock, Ind. No. 3146/2005, slip. op. (Supreme Co. Queens Cty. February 26, 2016) ("Second 440 Dec.") at 19. The court "credit[ed]" the testimony of counsel "in all relevant and pertinent aspects," id. at 4, but did "not credit[]" the portions of petitioner's testimony that were "inconsistent with [counsel's] testimony, the pretrial hearing and trial record and relevant to the issues that the [c]ourt must decide." Id. The court found petitioner's testimony credible only "to the extent it is consistent with counsel's testimony, the pretrial hearing and trial record, common sense and experience." Id.

The court noted counsel's experience and his knowledge of his duties as defense counsel with respect to the issue of a client testifying in "find[ing] that there is no reason to presume that he did not fulfill his duty with respect to informing [petitioner] of his right and decision to testify, simply because he does not have a specific recollection of the conversations many years later." Id. at 15. The court further found that "the surrounding circumstances and occurrences on the record support the presumption that [counsel]'s representation of [petitioner] conformed to his general practice. . . with respect to informing him that the decision to testify was his," id., and that the record suggested "no reason for counsel not to inform [petitioner] of what [counsel] knew was his right to make the decision whether or not to testify." Id. at 16.

As for petitioner's testimony, the court explained that it found much of it suspect in part because petitioner was an interested witness and in part because of his prior criminal record, but the principal reasons was petitioner's "patently false testimony" at the *Rodriguez* hearing denying that he ever used the name C-Lo. Id. at 18. In the court's view, this "demonstrated [petitioner's] willingness to take an oath and make statements that are not true when he believes it will be or could be beneficial to him." Id.

The court concluded that, "it is clear" that counsel would have "advised [petitioner] not to testify" for the reasons detailed in the testimony (the damage of admitting he was a block away, exposing himself to cross-examination on his use of the name C-Lo), and further concluded that "it is more credible that [petitioner], who admitted that he trusted [counsel] and had faith him, *followed counsel's advice and made the ultimate decision not to testify*" himself. Id. at 17-18 (emphasis added). [19]

## B.    Analysis

### 1.    Controlling Standards for Ineffective Assistance of Counsel Claims

Under long-established standards, to show that he was denied his Sixth Amendment right to the effective assistance of counsel, petitioner bears the considerable burden of showing that "counsel's representation fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. On the deficiency prong, "the[ ] inquiry must be whether counsel's assistance was reasonable considering all the circumstances." Id. at 688. The "court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct" and "must [ ] determine whether the [challenged actions or decisions] were outside the wide range of professionally competent assistance." Id. at 690.

To prevail on an ineffectiveness claim that the state court has rejected on the merits, a

---

[19] Without furnishing a complete citation, the briefs report that petitioner sought leave to appeal the denial of his 440 motion and that that application was denied by the Second Department on or about April 1, 2017.

petitioner must show that "the state court applied <u>Strickland</u> to the facts of his case in an objectively unreasonable manner." <u>Woodford v. Visciotti</u>, 537 U.S. 19, 25 (2002). This is a formidable burden: while "[s]urmounting <u>Strickland</u>'s high bar is never an easy task," <u>Padilla v. Kentucky</u>, 559 U.S. 356 (2010), "[e]stablishing that a state court's application of <u>Strickland</u> was unreasonable under §2254(d) is all the more difficult [because] [t]he standards created by <u>Strickland</u> and §2254(d) are *both* highly deferential, and when the two apply in tandem, review is doubly so." <u>Harrington v. Richter</u>, 562 U.S. 86, 105 (2011) (internal quotation and citation omitted) (emphasis added). <u>See also</u> <u>Cullen v. Pinholster</u>, 563 U.S. 170, 190 (2011) ("review of [state court]'s decision is ... *doubly deferential* [because] [w]e take a highly deferential look at counsel's performance [under <u>Strickland</u>] through the deferential lens of §2254(d)") (internal quotations and citations omitted) (emphasis added).

The <u>Strickland</u> standard, the Supreme Court has reminded district courts, is "a general one" and, therefore, the "range of reasonable applications is substantial." <u>Harrington</u>, 562 U.S. at 105. Further, "habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d)." <u>Id</u>. The difference is crucial: "[w]hen §2254(d) applies, the question is *not* whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland's</u> deferential standards." <u>Id.</u> (emphasis added). <u>See also</u> <u>Pinholster</u>, 563 U.S. at 196 (attorney need not state his reasons; rather, the court must "affirmatively entertain the range of possible reasons [ ] counsel may have had for proceeding as [he] did") (internal quotation marks omitted); <u>Greiner v. Wells</u>, 417 F.3d 305, 320 (2d Cir. 2005) (court must "look for legitimate justifications for [counsel's] conduct, including justifications transparent on the record and justifications offered by counsel").

With respect to each branch of petitioner's ineffective assistance of counsel claim, the question for this habeas Court is whether anything in the record or the extensive briefing suggests a basis for declining to afford the state court decision the doubled degree of deference the Supreme Court requires. See Harrington, 562 U.S. at 105 ("[e]stablishing that a state court's application of Strickland was unreasonable under §2254(d) is all the more difficult [because] [t]he standards created by Strickland and §2254(d) are *both* highly deferential, and when the two apply in tandem, review is doubly so") (internal quotation and citation omitted) (emphasis added); Cullen, 563 U.S. at 190 ("review of [state court]'s decision is ... *doubly deferential* [because] [w]e take a highly deferential look at counsel's performance [under Strickland] through the deferential lens of §2254(d)") (internal quotations and citations omitted) (emphasis added).

## 2. Discussion

Applying the foregoing standards, the Court finds that the state court did not unreasonably apply Strickland when it concluded that counsel's decision to forego the alibi defense was a sound strategy. With Carlmique as the *only* witness identifying petitioner as "C-Lo" and placing him at the crime scene, it was unquestionably a sound strategy for counsel to choose *not* to put on the stand two witnesses who would have strengthened the state's case by placing petitioner within a block of the homicide at the time it occurred and by likely confirming (through cross-examination) that petitioner's street name was C-Lo. See, e.g., Greiner v. Wells, 417 F.3d305, 323 (2d Cir. 2005) (reviewing court "will not normally fault counsel for foregoing a potentially fruitful course of conduct if that choice also entails a significant potential

downside") (internal quotation and citation omitted). *A fortiori*, petitioner cannot show that counsel's choice prejudiced him.[20]

Second, this Court cannot even reach the merits of the claim that counsel failed to adequately cross-examine Carlmique, which the state court rejected as unpreserved. New York's preservation requirement is an independent and adequate state law ground, Richardson v. Greene, 497 F. 3d 212, 217-18 (2d Cir. 2007), which renders the claim procedurally defaulted, or barred. Coleman v. Thompson, 501 U.S. 722, 729 (1991). Because petitioner has not addressed even the first half of the "cause and prejudice" required to lift the bar, the claim remains defaulted. See *supra* at note 13. In any event, this branch of petitioner's ineffectiveness claim would clearly fail the deficient performance prong of Strickland. Opting to keep the cross of Carlmique short, to avoid appearing to bully the young boy and thereby antagonizing the jury, is unquestionably strategic rather than deficient. See e.g. Romero v. United States, 2017 WL 4516819 (S.D.N.Y. 2017) (cross-examination "is generally a matter of trial strategy; as a result, it is virtually unchallengeable unless there is no strategic or tactical justification for the course taken") (internal quotation and citation omitted) (collecting additional authorities).

Finally, with respect to the branch alleging that counsel failed to advise petitioner that he had the right to decide whether to testify, the hearing court's findings, including its credibility assessments, are findings of fact entitled to a presumption of correctness and can be disturbed only by clear and convincing evidence to the contrary. See *supra* at p. 16 (citing authorities).

---

[20] The state court's rejection of petitioner's freestanding actual innocence claim requires no further discussion because the Supreme Court has not yet recognized such claims as a basis for habeas relief. See McQuiggin v. Perkins, 569 U.S. 383, 392 (2013).

Petitioner has not met, and on this record could not meet, these formidable burdens for disturbing the state court's ruling.

As this Court's summary of the hearing evidence plainly shows, there was a reasonable basis for the hearing court's decision to credit petitioner's counsel and to discredit key portions of petitioner's testimony. Counsel clearly knew that whether to testify was a defendant's decision to make and that it was his duty to so advise his client, and there was no reason not to credit his testimony that it was his general practice to discharge that duty and not to override a client's genuine desire to testify. Counsel's inability to recall *specific* conversations on this subject in *petitioner's* case does not undermine the importance of his general-practice testimony. To the contrary, it reflects the appropriate caution one might expect from an attorney under oath, particularly where, as here: (i) the specific conversations occurred more than eight years earlier; (ii) the case was one of more than one hundred criminal matters he had taken to trial; and (iii) in contrast to counsel's ordinary experience, the relevant exchanges among counsel, the defendant and the court did not occur on the record. It was not unreasonable therefore for the hearing court to rely on counsel's general-practice testimony. See, e.g., Carrion v. Smith, 549 F.3d 583, 590 (2d Cir. 2008) (court could rely on attorney's testimony about "established practice" given the passage of time; notes that evidence of habit permissible under the Federal Rules of Evidence); In short, as the Second Circuit recognized, "[t]ime inevitably fogs the memory of busy attorneys. That inevitability does not reverse the Strickland presumption of effective performance." Greiner, 417 F.3d at 326.[21] The hearing court's determination that it was petitioner who made

---

[21] Counsel's election to volunteer information about his medical condition and its possible effect on his memory also speaks positively to the question of his credibility.

the decision not to testify—by agreeing to follow his trusted attorney's advice—therefore stands.

The hearing court's determination that much of petitioner's testimony was not credible is likewise reasonable and presumed correct under the cited authorities. As the hearing court noted, the record amply documents petitioner's willingness to lie, from the pre-trial stage (when testifying at the *Rodriguez* hearing) through his final remarks to the Court moments before sentence was imposed. Additionally, much of petitioner's hearing testimony simply does not ring true, such as his assertions that he never discussed with his attorney the impact of the *Sandoval* ruling on the decision to testify, and that he would have pled guilty but without admitting his guilt if he had known that neither he nor the alibi witnesses would testify.

Finally, even assuming that counsel had rendered deficient performance by failing to advise petitioner that whether to testify was his decision to make, this branch of the claim would still not provide a basis for habeas relief because petitioner could not establish <u>Strickland</u> prejudice or that any error was not harmless. <u>See generally</u> <u>Yannai v. United States</u>, 346 F. Supp.3d 336 (E.D.N.Y. 2018) (Korman, J.) (concluding, after thorough review of Supreme Court case law, that when denial of the right to testify is raised in an ineffectiveness claim on collateral review, the presumption of prejudice that attaches to denial of "structural right" does not apply; instead, petitioner must show likely prejudice.). To the contrary, had petitioner testified, he would likely have strengthened the state's weak, one-eyewitness case by placing himself only a block away from the scene of the crime and by exposing himself to cross-examination or a rebuttal case that would place before the jury documentary proof that he had used the nickname C-Lo during three previous arrests.

## CONCLUSION

To be sure, a case of the nature recounted here, culminating in a sentence of 25 years to life, is discomfiting to a reviewing court. Nevertheless, the formidable standards for disturbing the state court's adjudication of petitioner's constitutional claims have plainly not been met. Therefore, for all the reasons discussed, the application of petitioner Corey D. Whitlock for relief under 28 U.S.C. § 2254 is denied in its entirety. Further, because Whitlock has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability will not issue.

SO ORDERED.

Dated: Brooklyn, New York
     August _8_, 2019

s/ Raymond J Dearie
RAYMOND J. DEARIE
United States District Judge
